## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **ALISHA RUDDEN**, on behalf of herself and all others similarly situated,<br><br>                    Plaintiff,<br>  v.<br><br>**UPPER PENINSULA POWER COMPANY**,<br><br>                 Defendant. | Case No.:<br><br>Judge:<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Alisha Rudden ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendant Upper Peninsula Power Company ("Defendant" or "UPPC") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions and her counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF CASE

1.      This class action arises out of the recent data breach ("Data Breach") involving Defendant, a Michigan-based private utility company that provides "customers with dependable service and safe, reliable energy."[1]

2.      Plaintiff brings this Complaint against Defendant for its failure to properly secure and safeguard the personally identifiable information that it collected and maintained as part of its regular business practices, including, but not limited to, names and Social Security numbers, (collectively defined herein as "PII").

---

[1] https://www.uppco.com/did-you-know/what-we-do/

3.      Upon information and belief, former and current Defendant customers are required to entrust Defendant with sensitive, non-public PII, without which Defendant could not perform its regular business activities, in order to obtain utility services from Defendant. Defendant retains this information for at least many years and even after the consumer relationship has ended.

4.      By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5.      On or about June 23, 2022, Defendant "experienced a network intrusion that affected a limited number of systems."[2] Defendant proceeded to investigate the nature and scope of the suspicious activity and subsequently concluded that "information may have been accessed by the unauthorized party in connection with this event."[3]

6.      According to Defendant's Important Security Notification letter (the "Notice Letter"), the compromised PII included individuals' names and Social Security numbers.[4]

7.      Defendant's investigation concluded that the PII compromised in the Data Breach included Plaintiff's and approximately 39,000 other individuals' information.[5]

8.      Defendant failed to adequately protect Plaintiff's and Class Members PII—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect customers' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiff and Class

---

[2] The *Notice Letter*. Sample copy available at https://www.mass.gov/doc/assigned-data-breach-number-28622-upper-peninsula-power-company/download
[3] *Id.*
[4] *Id.*
[5] https://apps.web.maine.gov/online/aeviewer/ME/40/af15baab-b66a-40fd-82d4-9db2b9e2c74c.shtml

Members. The present and continuing risk of identity theft and fraud to victims of the Data Breach will remain for their respective lifetimes.

9.      Moreover, after the Data Breach, Defendant waited five months (from June 23, 2022, to November 23, 2022) to notify Plaintiff and Class Members of the Data Breach and/or inform them that their PII was compromised. During this time, Plaintiff and Class Members were unaware that their sensitive PII had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm.

10.     In breaching its duties to properly safeguard customers' PII and give customers timely, adequate notice of the Data Breach's occurrence, Defendant's conduct amounts to negligence and/or recklessness and violates federal and state statutes.

11.     Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts at least to negligence and violates federal and state statutes.

12.     Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a

continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

13.     Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and (iv) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

14.     Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of herself and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## THE PARTIES

15.     Plaintiff Alisha Rudden is a natural person, resident, and a citizen of the State of Michigan, currently residing in Ishpeming, Michigan. She has no intention of moving to a different state in the immediate future. Plaintiff Rudden is acting on her own behalf and on behalf of others similarly situated.

16.     Defendant obtained and continues to maintain Plaintiff Rudden's PII and owed her a legal duty and obligation to protect that PII from unauthorized access and disclosure.

17.    Plaintiff Rudden would not have entrusted her PII to Defendant had she known that Defendant failed to maintain adequate data security.

18.    Plaintiff Rudden's PII was compromised and disclosed as a result of Defendant's inadequate data security, which resulted in the Data Breach.

19.    Plaintiff received a notice letter from Defendant, via U.S. mail, dated November 23, 2022, informing her that the information compromised in the Data Breach included her name and Social Security number.

20.    Defendant Upper Peninsula Power Company is a private utility company that provides electricity and other utilities to consumers. Defendant is incorporated under the laws of the state of Michigan, with its principal office located at 1002 Harbor Hills Drive, Marquette, Michigan 49855.

21.    The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

22.    All of Plaintiff's claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of

$5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.[6]

24.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District, the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District, regularly conducts business in Michigan, and has sufficient minimum contacts in Michigan.

25.     Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claim occurred in this district.

## **DEFENDANT'S BUSINESS**

26.     Defendant is a Michigan-based private utility company "providing customers with dependable service and safe, reliable energy."[7]

27.     Plaintiff and Class Members are current and former customers that obtained utility services from Defendant.

28.     In order to obtain utility services from Defendant, Plaintiff and Class Members were required to provide sensitive and confidential PII, including their names, Social Security numbers, and other sensitive information.

29.     The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted PII of Plaintiff and Class Members.

30.     Upon information and belief, Defendant made promises and representations to its customers, including Plaintiff and Class Members, that the PII collected from them as a condition

---

[6] According to the Office of Maine's Attorney General, a Maine resident was impacted in the Data Breach. *See* https://apps.web.maine.gov/online/aeviewer/ME/40/af15baab-b66a-40fd-82d4-9db2b9e2c74c.shtml

[7] https://www.uppco.com/did-you-know/what-we-do/

of receiving utility services would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

31.     Indeed, Defendant's Privacy Policy provides that:

The Company requires its Company Agents and Contractors who maintain Customer Account Information to implement and maintain reasonable data security procedures and practices appropriate to the private nature of the information received. These data security procedures and practices shall be designed to protect the Customer Account Information from unauthorized access, destruction, use, modification, or disclosure. The data security procedures and practices adopted by the Contractor or Company Agent shall meet or exceed the data privacy and security policies and procedures used by the Company to protect Customer Account Information.[8]

32.     Plaintiff and Class Members provided their PII to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

33.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members relied on the sophistication of Defendant to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

34.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep consumer's PII safe and confidential.

---

[8] https://www.uppco.com/wp-content/uploads/2019/04/UC6-C31.00-Standard-Rules-Regulations-Customer-Data-Privacy.pdf

35.     Defendant had obligations created by FTC Act, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

36.     Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' PII. Without the required submission of PII, Defendant could not perform the services it provides.

37.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

**THE DATA BREACH**

38.     On or about November 23, 2022, Defendant began sending Plaintiff and other victims of the Data Breach a Notice of Data Event letter, informing them that:

> On or around June 23, 2022, UPPCO experienced a network intrusion that affected a limited number of systems. Upon discovery, UPPCO immediately secured its network and engaged a third-party forensic firm to investigate the event. After a thorough investigation, UPPCO discovered that a limited amount of information may have been accessed by an unauthorized party in connection with this event. UPPCO has taken steps to address the event and remains committed to protecting information in our care.[9]

39.     Omitted from the Notice Letter were the date that Defendant discovered the Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, why it took over five months from the day of the Data Breach to inform impacted individuals that their information was involved, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their PII remains protected.

---

[9] *Notice Letter.*

40.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

41.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

42.     The attacker accessed and acquired files in Defendant's computer systems containing unencrypted PII of Plaintiff and Class Members, including their names and Social Security numbers. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

43.     Plaintiff further believes her PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

## DATA BREACHES ARE PREVENTABLE

44.     To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[10]

45.    To prevent and detect cyber-attacks Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

---

[10] *Id.* at 3-4.

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[11]

46.     To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

---

[11] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at:* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited Oct. 17, 2022).

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[12]

47.    Given that Defendant were storing the sensitive PII of its current and former customers, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

48.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of over 39,000 customers, including that of Plaintiff and Class Members.

---

[12] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Nov. 11, 2021).

**Defendant Acquires, Collects, and Stores Plaintiff's and Class Members' PII**

49.     As a condition to obtain utility services from Defendant, Plaintiff and Class Members were required to give their sensitive and confidential PII to Defendant.

50.     Defendant retains and stores this information and derives a substantial economic benefit from the PII that it collects. But for the collection of Plaintiff's and Class Members' PII, Defendant would be unable to perform its utility services.

51.     By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII from disclosure.

52.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

53.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiff and Class Members.

54.     Upon information and belief, Defendant made promises to Plaintiff and Class Members to maintain and protect their PII, demonstrating an understanding of the importance of securing PII.

55.     "The Company requires its Company Agents and Contractors who maintain Customer Account Information to implement and maintain reasonable data security procedures and practices appropriate to the private nature of the information received. These data security procedures and practices shall be designed to protect the Customer Account Information from unauthorized access, destruction, use, modification, or disclosure. The data security procedures

and practices adopted by the Contractor or Company Agent shall meet or exceed the data privacy and security policies and procedures used by the Company to protect Customer Account Information."[13]

### Defendant Knew or Should Have Known of the Risk Because Utility Companies in Possession of PII are Particularly Susceptible to Cyber Attacks

56.     Data thieves regularly target companies like Defendant's due to the highly sensitive information that they custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

57.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store PII and other sensitive information, like Defendant, preceding the date of the breach.

58.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

59.     Additionally, as companies became more dependent on computer systems to run their business,[14] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of

---

[13] https://www.uppco.com/wp-content/uploads/2019/04/UC6-C31.00-Standard-Rules-Regulations-Customer-Data-Privacy.pdf
[14]https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html

Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[15]

60.     As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

61.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[16]

62.     The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[17]

63.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

64.     Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store PII  are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[18]

---

[15] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

[16] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.

[17] *Id*.

[18] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-

65.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

66.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to potentially thousands of individuals' detailed, PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

67.     In the Notice Letter, Defendant makes an offer of 12 months of identity monitoring services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff and Class Members' PII. Moreover, once this service expires, Plaintiff and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

68.     Defendant's offering of credit and identity monitoring establishes that Plaintiff and Class Members' sensitive PII *was* in fact affected, accessed, compromised, and exfiltrated from Defendant's computer systems.

69.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

---

aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotect ion (last accessed Oct. 17, 2022).

70.     The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

71.     As a utility company in possession of its customers' and former customers' PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

## Value of Personally Identifying Information

72.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[19] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[20]

73.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[21] For example, Personal Information can be sold at a price ranging from $40

---

[19] 17 C.F.R. § 248.201 (2013).
[20] *Id.*
[21] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).

to $200.[22] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[23]

74.      For example, Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[24]

75.      What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

76.      Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link

---

[22] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).
[23] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 217, 2022).
[24] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Oct. 17, 2022).

the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[25]

77.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number and name.

78.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[26]

79.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

80.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

---

[25] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Oct. 17, 2022).
[26] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*:
https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 17, 2022).

As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[27]

81.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

**Defendant Fails to Comply with FTC Guidelines**

82.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

83.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[28]

84.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[29]

---

[27] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).
[28] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 17, 2022).
[29] *Id.*

85.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

86.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

87.     These FTC enforcement actions include actions against utility companies, like Defendant.

88.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

89.     Defendant failed to properly implement basic data security practices.

90.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

91.     Upon information and belief, Defendant was at all times fully aware of its obligation to protect the PII of its customers, Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

### Defendant Fails to Comply with Industry Standards

92.     As noted above, experts studying cyber security routinely identify entities in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

93.     Several best practices have been identified that, at a minimum, should be implemented by utility companies in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

94.     Other best cybersecurity practices that are standard in the public utilities industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

95.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

96.     These foregoing frameworks are existing and applicable industry standards in the public utilities industry, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## COMMON INJURIES & DAMAGES

97.     As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) loss of time incurred due to actual identity theft; (e) loss of time due to increased spam and targeted marketing emails; (f) the loss of benefit of the bargain (price premium damages); (g) diminution of value of their PII; and (i) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

**The Data Breach Increases Plaintiff's and Class Member's Risk of Identity Theft**

98.     The unencrypted PII of Plaintiff and Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

99.     Unencrypted PII may also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Simply, unauthorized individuals can easily access the PII of Plaintiff and Class Members.

100.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

101.     Plaintiff's and Class Members' PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

**Loss of Time to Mitigate the Risk of Identity Theft and Fraud**

102.     As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

103.     Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendant's Notice Letter encourages them, monitor their financial accounts for many years to mitigate the risk of identity theft.

104.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching the Data Breach's occurrence and reviewing their financial accounts for fraudulent activity.

105.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[30]

106.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[31]

107.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[32]

---

[30] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[31] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).

[32] Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited Sep 13, 2022).



108.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

**DIMINUTION OF VALUE OF PII**

109.    PII is a valuable property right.[33] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

---

[33] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").

110.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[34]

111.    An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[35] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[36,37] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[38]

112.    As a result of the Data Breach, Plaintiff's and Class Members' PII , which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

113.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including,

---

[34] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[35] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

[36]  https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[37]  https://datacoup.com/

[38]  https://digi.me/what-is-digime/

specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

114.    The fraudulent activity resulting from the Data Breach may not come to light for years.

115.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII .

116.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to potentially hundreds of thousands of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

117.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

**Future Costs of Credit and Identity Theft Monitoring is Reasonable and Necessary**

118.    Given the type of targeted attack, the sophisticated criminal activity, and the type of PII involved in this case, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

119.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her PII was used to file for unemployment

benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

120.    Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

121.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII .

## Loss of Benefit of the Bargain

122.    Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant, whether directly or indirectly, through one of its partner dealerships for Defendant's products and/or services, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the service and necessary data security to protect the PII , when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

## Plaintiff Rudden's Experience

123.    Plaintiff Rudden is a (and has been for approximately twenty years) UPPC customer. When she first became a customer, she was required to provide her PII to Defendant in order to obtain utility services from UPPC.

124.    At the time of the Data Breach—June 23, 2022— Defendant retained Plaintiff's PII in its system.

125.    Plaintiff Rudden is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. she has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

126.    Plaintiff Rudden  received the Notice Letter, by U.S. mail, directly from Defendant, dated November 23, 2022. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including her name and Social Security number.

127.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach; researching the Data Breach's occurrence and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff has spent significant time dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

128.    Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) the loss of benefit of the bargain (price premium damages); (e) diminution of value of her PII; and (f) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

129.     The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

130.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

131.     Plaintiff Rudden has a continuing interest in ensuring that her PII, which, upon information and belief, remain backed up in Defendant's possession, is protected and safeguarded from future breaches.

## **CLASS ALLEGATIONS**

132.     Plaintiff brings this nationwide class action on behalf of herself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

133.     The Class that Plaintiff seeks to represent is defined as follows:

All individuals residing in the United States whose PII was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendant on or about November 23, 2022 (the "Class").

134.     Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

135.    Plaintiff reserves the right to amend the definition of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

136.    <u>Numerosity:</u> The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. At least 39,000 individuals were notified by Defendant of the Data Breach, according to the breach report submitted to Maine Attorney General's Office.[39] The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

137.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

    a.    Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

    b.    Whether Defendant had respective duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

    c.    Whether Defendant had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

    d.    Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

    e.    Whether and when Defendant actually learned of the Data Breach;

---

[39] https://apps.web.maine.gov/online/aeviewer/ME/40/af15baab-b66a-40fd-82d4-9db2b9e2c74c.shtml

f.   Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g.   Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.   Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.   Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;

k.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

138.   <u>Typicality</u>: Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

139.   <u>Policies Generally Applicable to the Class:</u> This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

140.    Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages she has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

141.    Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

142.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that

experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

143.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

144.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

145.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

146.    Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

147.    Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

   a.  Whether Defendant failed to timely notify the Plaintiff and the class of the Data Breach;

   b.  Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c.  Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII; and Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### FIRST COUNT
### Negligence
### (On Behalf of Plaintiff and the Class)

148.   Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

149.   Defendant require its customers, including Plaintiff and Class Members to submit non-public PII in the ordinary course of providing its financing services.

150.   By collecting and storing this data in its computer property, and sharing it and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

151.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

152.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

153.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII , a necessary part of being customers of Defendant.

154.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

155.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

156.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII  it was no longer required to retain pursuant to regulations.

157.    Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the PII  of Plaintiff and the Class.

158.     Defendant breached its duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.   Failing to adequately monitor the security of their networks and systems;

    c.   Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

    d.   Allowing unauthorized access to Class Members' PII;

    e.   Failing to detect in a timely manner that Class Members' PII had been compromised;

    f.   Failing to remove former customers' PII  it was no longer required to retain pursuant to regulations,

    g.   Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

    h.   Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

159.     A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

160.     It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was

reasonably foreseeable given the known high frequency of cyberattacks and data breaches in both the financial services and medical industry.

161.    Defendant has full knowledge of the sensitivity of the PII  and the types of harm that Plaintiff and the Class could and would suffer if the PII  were wrongfully disclosed.

162.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII  of Plaintiff and the Class, the critical importance of providing adequate security of that PII , and the necessity for encrypting PII  stored on Defendant's systems.

163.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

164.    Plaintiff and the Class had no ability to protect their PII  that was in, and possibly remains in, Defendant's possession.

165.    Defendant was in a position to protect against the foreseeable harm suffered by Plaintiff and the Class as a result of the Data Breach.

166.    Defendant had and continues to have a duty to adequately disclose that the PII  of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII  by third parties.

167.    Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

168.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

169.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII  of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

170.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII  and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII  it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

171.    Defendant's violation of Section 5 of the FTC Act constitutes negligence.

172.    Plaintiff and the Class are within the class of persons that the FTC Act was intended to protect.

173.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class. The GLBA, with its Privacy Rule, Regulation P, and Safeguards Rule, was similarly intended to guard against harms such as the harm that occurred as a result of the Data Breach.

174.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity of how their PII  is used; (ii) the compromise, publication, and/or theft of their PII ; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud,

and/or unauthorized use of their PII ; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII , which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiff and the Class; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII  compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and the Class.

175.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

176.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII , which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII  in its continued possession.

177.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

178.    Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and insecure manner.

179.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## SECOND COUNT
### Negligence *Per Se*
### (On Behalf of Plaintiff and the Class)

180.    Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

181.    Pursuant to Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45), Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

182.    Defendant breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

183.    Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

184.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

185.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their PII.

186.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**THIRD COUNT**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

187.    Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

188.    When Plaintiff and Class Members provided their PII to Defendant in exchange for Defendant's utility services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information and to destroy any PII that it was no longer required to maintain.

189.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant on the other, is demonstrated by their conduct and course of dealing.

190.    Defendant solicited, offered, and invited Plaintiff and Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

191.    In accepting the PII of Plaintiff and Class Members, Defendant understood and agreed that it was required to reasonably safeguard the PII from unauthorized access or disclosure.

192.    Given the sensitive and confidential PII at issue, reasonable consumers expect that a promise to protect that PII is inherent to every transaction in which PII is involved.

193.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

194.     Plaintiff and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

195.     Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

196.     Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

197.     Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

198.     Defendant breached its implied contracts with Class Members by failing to safeguard and protect their PII or to destroy it once it was no longer necessary to retain the PII .

199.     As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

200.     Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

201.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**FOURTH COUNT**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

202.   Plaintiff repeats and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

203.   This Count is pleaded in the alternative to Plaintiff's breach of contract claim (Count III).

204.   Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of their payments for Defendant's services and by providing their valuable PII to Defendant.

205.   Plaintiff and Class Members provided Defendant their PII with the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures. In exchange, Plaintiff and Class members should have received adequate protection and data security for such PII held by Defendant.

206.   Defendant benefited from receiving Plaintiff's and Class Members' payments for services and from receiving their PII through its ability to retain and use that information for its own benefit. Defendant understood and accepted this benefit.

207.   Defendant knew Plaintiff and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

208.   Defendant also understood and appreciated that Plaintiff's and Class Members' PII was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

209.   Defendant failed to provide reasonable security, safeguards, and protections to the PII of Plaintiff and Class Members.

210.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

211.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead made calculated decisions to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

212.    Under the principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures mandated by industry standards.

213.    Defendant's enrichment at the expense of Plaintiff and Class Members is and was unjust.

214.    Defendant acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

215.    If Plaintiff and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

216.    Plaintiff and Class Members have no adequate remedy at law.

217.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury as described herein.

218.    Plaintiff and the Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grants the following:

A. For an order certifying the Class, as defined herein, and appointing Plaintiff and her Counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of

   Plaintiff and Class Members, including but not limited to an order:

   i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

   ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

   iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v.   prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi.   Vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.   requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.   requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.   requiring Defendant to conduct regular database scanning and securing checks;

xi.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees,

with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.  requiring Defendant to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.  requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.  requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect Themselves;

xvi. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on any and all issues in this action so triable as of right.

Dated: January 23, 2023

Respectfully Submitted,

By: /s/ Nick Suciu

Nick Suciu
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
Email: nsuciu@milberg.com

*Attorney for Plaintiff and the Proposed Class*